**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**


**HOME DESIGN SERVICES, INC.,**

     **Plaintiff,**

**v.**                                     **Case No. 4:08cv355/MCR/CAS**

**TURNER HERITAGE HOMES,
INC., et al.,**

     **Defendants.**

_____/

## ORDER

Plaintiff Home Design Services, Inc. ("Home Design") filed this suit against Defendants for copyright infringement of an architectural home design titled "HDS-2089," claiming that Defendants built 165 infringing homes as part of their "Laurent" and "Dakota" designs based on slightly modified copies of the HDS-2089.  A five-day jury trial was held in March 2014, with a focus on whether the Laurent and Dakota designs were sufficiently similar to the HDS-2089 to constitute infringement.[1]  The jury returned a verdict in favor of Home Design, finding that HDS-2089 was a validly registered and original work to which Defendants had access, that all of Defendants' allegedly infringing home designs were substantially similar to HDS-2089 and were not independently created, and that each Defendant infringed Home Design's copyright.  The jury awarded Home Design $127,760 in actual damages, and zero in lost profits.  Pending before the Court are the parties' Motions for Judgment as a Matter of Law and alternative Motions for a New Trial, which require the Court to decide, first, whether the evidence supports the jury's verdict on infringement and, second, whether the jury's

---

[1] Home Design filed an amended complaint in March 2009.  The case was initially assigned to Judge Stephen P. Mickle of this Court, who denied Defendants' Motion for Summary Judgment after a long discovery period.  *See* Doc. 224.  The parties then mediated the case, without success, and the case was transferred to the undersigned on June 3, 2011.  *See* Doc. 317.  In June 2011, Defendant Turner Heritage Homes filed for Chapter 11 bankruptcy, resulting in an automatic stay of the instant case through August 2013.  *See* Docs. 331 & 345.

damages award fails to account for the evidence of Defendants' profits presented at trial.[2]  On careful consideration of the record and relevant law, the Court finds that the jury's verdict on infringement must be overturned.  Additionally, should the Eleventh Circuit disagree and reinstate the jury's verdict, the Court also finds that the jury's verdict on damages should stand.

Home Design is a residential design firm that sells pre-drawn house plans through magazine publications and websites.  The company serves different clients, including builders who seek routine designs with square-footage specifications, individuals who want a custom home from scratch, and those who want to modify one of Home Design's stock plans for building.  The price of Home Design's stock plans varies based on square footage, but those purchased for a one-time use typically cost around $1,000.[3]  Defendants Doug Turner and his father, Fred Turner, were directors of Defendant, Turner Heritage Homes, Inc., a general contracting company that built homes in planned residential communities until it went out of business in 2009.  At the time of Defendants' alleged infringing activity, Turner Heritage Homes had multiple "selling companies" that sold homes to buyers in particular communities.  The selling companies had no employees or offices of their own, and were managed directly by the Turners.[4]  According to Doug Turner, Turner Heritage Homes did not design plans but instead purchased plans for its homes from a company called Creative Residential Design.[5]  Defendants conceded that the Laurent home plan was created in 1999, and that their Dakota plan was simply a slight modification of the Laurent, with the primary distinction being the Dakota's inclusion of a "his and hers" closet.

---

[2] Also pending before the Court are Plaintiff's Motion for Leave to File a Reply (Doc. 434); Plaintiff's Motion to Exclude the Testimony of Defendants' Expert Robert Koch (Doc. 393); Plaintiff's Motion for a Curative Instruction to the Jury (Doc. 394); and the parties' initial Motions for Judgment as a Matter of Law in open court (Docs. 408 and 410).

[3] According to Zirkel, a custom plan for a 3,000 square foot home typically costs $7,000, whereas a builder's plan for the same home costs $4,000 plus an additional "reuse fee" each additional time the builder uses the plan.

[4] Some of the selling companies were corporate entities, such as Summerbrook Homes, Inc. Doug Turner was listed as its president and director, and Fred Turner was titled the chief executive officer.  According to Doug Turner, the companies have since been sold and closed.  He also said that cumulatively, the companies took a loss and that "[t]here was no money made in the end."

[5] Turner Heritage Homes submitted invoices reflecting payments to Creative Residential Design.

Two key issues at trial were whether HDS-2089 is an original design deserving of copyright protection, and whether the Turners had access to the design.   Home Design's chief executive officer, James Zirkel, testified that he created HDS-2089 in 1991 for a builder named Bill Silliman.[6]   Home Design registered HDS-2089 with the Copyright Office in August 1991,[7] and aggressively marketed the work during the mid-1990s, selling the plan over 3,000 times.   From 1989 through 2005, Home Design attended annual marketing events where it displayed HDS-2089, along with its magazines and plan books.   Defendant Doug Turner purchased a plan book at one of these events in 1994.   Although it is unclear whether the plan book Turner purchased included HDS-2089, it was undisputed that the plan was on display at Home Design's event booths and also that Home Design's employees were instructed to provide the annual magazine, which included the HDS-2089 floor plan, to each builder who purchased a plan book.   It was also undisputed that Doug Turner was on Home Design's mailing list for the company's magazines in 1995 and 1997, and that those particular editions included the HDS-2089 floor plan.

Much of the testimony at trial focused on the similarities and dissimilarities between HDS-2089 and Defendants' Laurent and Dakota plans.   Zirkel compared the HDS-2089 floor plan with one of the first few Laurent homes that Defendants built.[8]

---

[6] Zirkel testified that he also designed a plan for Silliman called the "Timberwood," as well as a plan titled "HDS-2041," but that he did not use the Timberwood to develop HDS-2089 and that  HDS-2041 was not related to HDS-2089 in any way.  Zirkel also testified about the differences among the works. For example, Zirkel stated that the Timberwood and HDS-2089 have different master bathrooms, pantries, front doors, and hallways; HDS-2041 and HDS-2089 have differences in their front entries, nooks, master bedrooms, master bathrooms, pool bathrooms, and hallways.  Zirkel said that he found a total of forty-four major differences in HDS-2041 and HDS-2089.  In an effort to counter Home Design's position that HDS-2089 was original to the author, the defense read the deposition of Michael Sopoliga into evidence at trial.  Sopoliga, who worked for Home Design from 1987 to 1997, testified that Zirkel was nicknamed "Edward Scissorhands" because he was often seen with stacks of plan books and scissors, cutting different designs.  Sopoliga said that in the time he worked for Home Design between 1987 and 1997, he never saw Zirkel create an original home design without having the aid of "bits and pieces of other designs."

[7] The registration subsequently was amended and designated as an architectural work instead of a graphic work.  See 17 U.S.C. § 102(a); Oravec v. Sunny Isles Luxury Ventures, L.C., 527 F.3d 1218, 1228 (11th Cir. 2008) ("The holder of a copyright in an architectural plan has two forms of protection, one under the provision for an 'architectural work' under 17 U.S.C. § 102(a)(8), and another under the provision for a 'pictorial, graphical, or sculptural work' under 17 U.S.C. § 102(a)(5).").

[8] Given that Defendants allegedly built over 160 distinct homes using their Laurent and Dakota plans, and that some of their Laurent and Dakota designs were derivatives of earlier ones, different

According to Zirkel, the two plans were similar "except for a few minor parts." Differences that Zirkel identified, which he felt were "minor," included different placements of the fireplaces; different orientations of the water closets; and the fact that the Laurent has a square corner on a wall whereas the corresponding wall in HDS-2089 is angled with different dimensions.   Zirkel conceded that there were nearly twenty distinct differences between the HDS-2089 and the Laurent he was asked to compare, but reiterated that there are "numerous small changes, but not major changes" in the designs, and that some of those differences he considered "options."[9]

Home Design's expert Kevin Alter compared HDS-2089 to the Laurent and Dakota designs and testified that he found the plans "extraordinarily similar," to the point he felt the HDS-2089 may have been copied.   Alter noted that "the overall shape, the massing, the individual layout of the rooms is the same.[10]   They all have the same shape, width, and length. . . .   They have the same organization of rooms.   You enter

---

versions of the Laurent and Dakota plans were admitted into evidence at trial.   For illustration purposes, Zirkel was asked to compare the HDS-2089 to the third Laurent home that Defendants built.   Subsequent witnesses compared the HDS-2089 with other Laurent homes.   Although the parties' use of distinct Laurent plans was potentially confusing to the jury, neither party objected.

[9] For example, Zirkel testified that the Laurent has a single front-door, but HDS-2089 has double doors; the Laurent's front porch is flush with the front bedroom and garage, but HDS-2089's porch projects beyond those thresholds; the foyer of the Laurent has archways and columns that lead into the living spaces, and although HDS-2089 has openings that lead into the same rooms, they are either not arched or lack the columns; and that the Laurent has a squared wall adjoining the foyer, living room, and family room, but HDS-2089 has an angled wall.   Zirkel identified other differences with this one particular Laurent model, including that the entry to the back hallway in the Laurent is an archway, but the entry to the back hallway in HDS-2089 is squared and has a sliding pocket-door; the secondary pool bathroom has no linen closet in the Laurent, but there is a linen closet in HDS-2089; the two designs have different windows in terms of size and location in the living rooms, back bedrooms, and master bedrooms; the Laurent has vaulted ceilings in the master bedroom, and HDS-2089 has a ten-foot flat ceiling; the ceilings in the secondary bedrooms are also different heights; the Laurent has a ten-foot ceiling in the living room, but HDS-2089 has a twelve-foot ceiling in that area; the angled walls in the Laurent's breakfast nook are asymmetrical and have two windows, but the angled walls in HDS-2089's nook are symmetrical and have one window with a soffit that runs along the walls; the kitchen in the Laurent is larger than the one in HDS-2089, and the dishwashers are in different locations in relation to the sinks; HDS-2089 has a built-in desk in the kitchen that is not present in the Laurent; the water closets in the master bathrooms have toilets facing different directions, which leads to a deeper space in the Laurent's hallway adjoining the kitchen than the niche in HDS-2089; the Laurent has a smaller enclosed shower than the one in HDS-2089, which includes an additional walk-in area; the master closet in the Laurent is four inches wider than the one in HDS-2089; and, finally, the master bedroom in HDS-2089 has built-in architectural features like plant shelves that do not exist in the Laurent.   Zirkel also identified differences between the HDS-2089 and other Laurent's, including Plaintiff's Exhibits 71.84, 71.68, 71.54, and 71.47.

[10] Alter defined the term "massing" as "the overall shape of the volume, the shape, the particularities of [a home plan's] overall configuration."

the foyer, the dining room and living room on other side."  Alter found the "overall organization of traffic patterns" identical and the arrangement of rooms the same.  He acknowledged "modest differences" among the designs, but felt that some of those differences did not make sense in the Laurent design, suggesting that HDS-2089 had been copied.   For example, he said that "[t]he master bath water closet faces this way [but in Defendants' plan] it is turned. . . [resulting in] wasted space here in a plan that is otherwise very, very efficient. . . ."[11]   Finally, Alter considered certain distinctions between the plans insignificant, such as the placement of the fireplace, calling them "afterthoughts."

Defense expert Robert Koch reviewed HDS-2089 and another Laurent design, and identified substantial dissimilarities between the designs, many of which he attributed to the Laurent's more "traditional" design as compared to the HDS-2089, which he felt was designed to be a "modern," "casual," and "relaxed" home.  According to Koch:

- The entire elevation of the Laurent is different than the HDS-2089, and includes "a very expensive front porch that reache[s] from the front door all the way over [to] the bedroom . . . on the opposing side," a feature that is missing from the HDS-2089;

- The entry in the Laurent has a single door with walls and formal cased openings separating the spaces in the foyer, but the entry in HDS-2089 has double doors and no cased openings or headers above the walls in the foyer, causing a less formal and more open environment;

- The Laurent's family room has more traditional French doors with flanking formal windows, whereas the HDS-2089 has a modern sliding-glass door that creates a more casual feel;

- The backdoor to the Laurent's screened porch swings inward, whereas the backdoor in HDS-2089 swings outward to a covered patio;

---

[11] Alter also found that the thickness of a wall in HDS-2089's bathroom was necessary to accommodate plumbing, and although the bathtub abuts a different wall in the Laurent he compared, the thickness in the first wall remains.  Alter explained that this indicated to him that HDS-2089 was copied.

- The nook in the Laurent has separate windows, reflecting a traditional design, whereas the nook in HDS-2089 has one continuous glass partition, which creates a more modern appearance;
- The Laurent's master bedroom has a single door with a formal set of conventional windows, but HDS-2089 has double doors with a single high window located above the bed's headboard, a more modern feature;[12]
- The home's porches have different configurations and columns;
- The fireplace in the Laurent is in a different location, designed specifically to accommodate and create space for a flat-screen television, a feature that is missing in the HDS-2089;
- The hallways have different dimensions and openings;
- Only the Laurent has a door between the master bedroom and the master bathroom;
- The water closets are positioned differently, causing a difference in hallway areas between the nooks and the master bedrooms and better obscuring the toilet from view in the Laurent;
- The master bathrooms have a "totally different" configuration, including a more traditional door shower in the Laurent versus a more modern doorless shower in the HDS-2089;
- The master bathroom in the Laurent has a linen closet separating the bathtub from the shower, whereas HDS-2089 has the linen closet between the water closet and the shower;
- The door between the garages and the mud rooms swing in different directions;
- The Laurent's kitchen has cabinetry next to the stove range, but HDS-2089 has a desk;
- The wall that separates the family room and the kitchen in HDS-2089 does not extend all the way to the ceiling like it does in the Laurent, which again creates a more "casual," "open," and "informal" space in the HDS-2089;

---

[12] According to Koch, the Laurent's single bedroom door was intended to restrict views into the master bedroom from the primary living areas, whereas the HDS-2089 allowed a "transparent view" from those spaces.  In addition, Koch testified that the relatively high positioning of the single window in the master bedroom of the HDS-2089 "completely change[s] the character of the room."

- The secondary bathrooms have different style counter-tops, which affect access to the water-closet basin;

- There is no linen closet in the Laurent's pool bathroom like the one in HDS-2089;

- The secondary bedrooms have different windows and dimensions; and the living rooms have different angled walls abutting the family rooms, as well as different ceiling heights.[13]

On the matter of damages, Home Design sought to demonstrate that the licenses for each of the infringing houses would have cost $216,830, and that this amount reflected its actual damages in the form of lost revenues on design sales. *See* Doc. 425, at 154. To that end, Home Design submitted testimony from Zirkel indicating the standard prices of its floor plans, and argued in closing that the appropriate measure of damages is the amount of revenue it lost on the 165 Laurents and Dakotas, assuming Defendants had purchased each individual floor plan for a one-time use.[14] Home Design also sought to show that Defendants derived profits from their infringement based on the revenues they received on the infringing homes. On this issue, Home Design relied primarily on the Defendants' evidence of its own financial data, as well as the parties' Joint Exhibit 1, which detailed the revenues and expenses Defendants' incurred on the sale of their Laurent and Dakota homes.[15]

Turner Heritage Homes submitted evidence of the prices it charged in 2001 for various plans in different geographic locations. According to Doug Turner, the difference in pricing depended on the square footage, changes in design features, and location (including land cost), but that the "market didn't see a lot of value in a particular

---

[13] Koch also reviewed the Dakota plan in Defendant's Exhibit 212(c), and identified various dissimilarities in comparison to HDS-2089. On cross examination, Koch acknowledged that not all of the Laurent homes have the same dissimilarities as one another.

[14] Regarding its actual damages, Home Design also relied on the testimony of defense expert, Henry Fishkind. *See* Doc. 425, at 154.

[15] Joint Exhibit 1 was admitted into evidence on the opening day of trial. Joint Exhibit 1 lists the Laurent homes that Defendants constructed between July 2000 and September 2008, shows each home's sale price, direct costs incurred by the selling company (excluding employee salaries, overhead costs, and administrative expenses), the amount paid to Turner Heritage Homes by the selling company for the construction, direct costs incurred by Turner Heritage Homes in connection with the actual construction (again, excluding employee salaries, overhead costs, and administrative expenses), and an ultimate gross profit figure based on the difference between the sales price and the job cost.

plan" and that there was not an amount added to the price due to the floor plan itself. According to Doug Turner, the total operating profit Turner Heritage Homes and the selling companies received from the construction and sale of the Laurent and Dakota designs was approximately $7.36 million.[16]  Turner explained, however, that there were indirect costs that reduced that profit figure, and also that job costs began exceeding sales prices in 2008 due the real estate market's collapse, thereby impacting their ability to make a profit.

Turner Heritage Homes submitted its financial statements, which showed that the company (including its selling companies) had a net income of $451,293 in 2000.  The statements reflect payments of cash dividends to investors, mostly to Doug and Fred Turner, of $430,000 during the year 2000, a majority of which they loaned back to the company as capital for the upcoming year.  Doug Turner said that although he hoped the loans would be repaid, all of the money he loaned to the company was lost when the real estate market collapsed around 2008.  He stated that he was paid between $60,000 and $100,000 in salary in 2000, in addition to earning about 35% of the total payments to investors.  He also testified that although Fred Turner was not paid a salary, he received about 55% of the investor payments.

Defendants presented the testimony of Henry Fishkind, an economist, who also conducted an extensive evaluation of Defendants' profits.  Fishkind took the parties' stipulated figures for gross profits on the Laurent and Dakota sales, totaling $7,361,772, and subtracted expected administrative expenses of $4,562,326 and interest expenses on mortgages and loans of $1,330,776, which, according to Fishkind, left only about $1.4 million in earnings.  From there, Fishkind determined that all remaining profits were attributable either to appreciation in land holdings ($1,720,327), or to payments for "returns on equity" ($2,629,325) in the form of investor dividends that were mostly paid to the Turners.  The result, according to Fishkind, was a loss to Defendants on the Laurent and Dakota sales at issue.  Thus, Fishkind concluded, there was no profit attributable to Defendants' use of the Laurent and Dakota home designs.

---

[16] The parties stipulated that the selling companies' gross profits related to the 165 infringing homes was $1,789,925, and that Turner Heritage Homes's gross profits relating to those same homes was $5,571,797, for a total of $7,361,772.  *See* Doc. 424, at 236.

At the close of trial, the jury awarded $127,760 in actual damages, but nothing for the Defendants' profit from the infringement.[17]

**Discussion**

At the conclusion of Home Design's case-in-chief, Defendants moved for Judgment as a Matter of Law on liability. The parties argued the motion, and the Court took the matter under advisement. Subsequently, Home Design moved for Judgment as a Matter of Law in regards to damages, which the Court also took under advisement. After the jury's verdict, the Court ordered the parties to submit written briefs on their motions for Judgment as a Matter of Law, which they did. In their motion, Defendants argue they are entitled to judgment as a matter of law, or alternatively a new trial, because no reasonable juror could have found that the allegedly infringing works were "substantially similar" to HDS-2089. Defendants also argue that Home Design failed to demonstrate that it has a valid copyright in HDS-2089, or that Fred Turner is individually liable. Home Design moves for judgment as a matter of law, or alternatively for a new trial, on the jury's rejection of its claim for profit damages.[18]

<u>Motion for Judgment as a Matter of Law - Infringement</u>

Judgment as a matter of law is appropriate "[i]f a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue . . . ." Fed. R. Civ. P. 50(a)(1). A party may move for such judgment "at any time before the case is submitted to the jury," and the movant must "specify the judgment sought and the law and facts that entitle the movant to the judgment." Fed. R. Civ. P. 50(a)(2). The court may submit the action to the jury and reserve ruling on the questions raised, and the movant then may renew the motion after the jury is discharged. Fed. R. Civ. P. 50(b). In ruling on a motion for judgment as a matter of law, the court does not re-weigh the evidence but instead draws "all inferences in favor of the non-moving party," *Telecom Tech. Servs. Inc. v. Rolm Co.*, 388 F.3d 820, 830 (11th Cir. 2004), and should "affirm the jury verdict

---

[17] The jury verdict form specifically asked the jury to determine the "amount of actual damages [that Home Design] has suffered as a result" of Defendants' infringement. *See* Doc. 414, at 5. The amount the jury attributed to actual damages reflects the amount of Home Design's lost design fees for the 165 infringing homes Fishkind had calculated under the first of three distinct calculations he performed, which resulted in the highest measure of actual damages to Home Design.

[18] Many of the arguments made in open court are moot in light of the jury's verdict.

unless there is no legal basis upon which the jury could have found for [the non-moving party]."  *Id.*  The evidentiary standard is essentially the same as the one for summary judgment; that is, the court must find that "under the governing law, there can be but one reasonable conclusion as to the verdict."  *Herzog v. Castle Rock Entm't*, 193 F.3d 1241, 1247 (11th Cir. 1999) (quoting *Brady v. S. R. Co.*, 320 U.S. 476, 479-80 (1943)); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986) (describing the relevant inquiry as "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law").

The United States Constitution provides that "Congress shall have Power . . . To promote the Progress of Science . . . by securing for limited Times to Authors . . . the exclusive Right to their respective Writings . . . ."  U.S. Const. art. I, § 8, cl. 8.  Pursuant to that authority, the Copyright Act extends copyright protection to "original works of authorship fixed in any tangible medium of expression," 17 U.S.C. § 102(a), and gives copyright owners certain exclusive rights, such as the rights to reproduce the works and prepare derivative works based upon the copyrighted work.  17 U.S.C. § 106.  Works of authorship include architectural works, like the home designs at issue in this case.  *See Intervest Constr., Inc. v. Canterbury Estate Homes, Inc.*, 554 F.3d 914, 919 (11th Cir. 2008).   An architectural work "is the design of a building as embodied in any tangible medium of expression, including a building, architectural plans, or drawings." 17 U.S.C. § 101.  The protected elements of an architectural work include "the overall form as well as the arrangement and composition of spaces and elements in the design, but does not include individual standard features," *id.*, such as "common windows, doors, and other staple building components," which are instead "ideas" exempt from copyright protection.   *Intervest*, 554 F.3d at 919; *see also* 17 U.S.C. §102(b) ("In no case does copyright protection for an original work of authorship extend to any idea . . . .");  *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 345 (1991) ("The most fundamental axiom of copyright law is that no author may copyright his ideas . . . .").

For copyright infringement, a plaintiff must prove: "(1) ownership of a valid copyright, and (2) copying of protectable elements."[19] *Miller's Ale House, Inc. v. Boyton Carolina Ale House, LLC*, 702 F.3d 1312, 1325 (11th Cir. 2012) (quoting *Oravec v. Sunny Isles Luxury Ventures, L.C.*, 527 F.3d 1218, 1223 (11th Cir. 2008). In order to establish ownership of a valid copyright, the plaintiff must prove, among other things, that the work is original.[20] *Feist*, 499 U.S. at 345. "Original, as the term is used in copyright, means only that the work was independently created by the author (as opposed to copied from other works), and that it possesses at least some minimal degree of creativity." *Id.* To establish copying, the plaintiff must show as a factual matter that the defendant copied the protected work, and, as a mixed question of law and fact, that the protected expression itself was copied. *Dream Custom Homes, Inc. v. Modern Day Const., Inc.*, 476 F. App'x 190, 191 (11th Cir. 2012). In the absence of direct proof of copying, a plaintiff may prove copying "by demonstrating that the defendants had access to the copyrighted work and that the works are 'substantially similar.'" *Oravec v. Sunny Isles Luxury Ventures, L.C.*, 527 F.3d 1218, 1223 (11th Cir. 2008). To show access, the plaintiff need not prove "actual viewing and knowledge" but simply a "reasonable opportunity to view" the work. *Herzog v. Castle Rock Entm't*, 193 F.3d 1241, 1249 (11th Cir. 1999). The test for substantial similarity for architectural works is "whether a reasonable jury could find the competing designs substantially similar *at the level of protected expression*." *Miller's Ale House*, 702 F.3d at 1325 (emphasis added). "[S]pacial depictions of rooms, doors, windows, walls, etc." are not

---

[19] In addition to a direct infringer, a contributory infringer may be held liable if he has knowledge of infringing activity and "induces, causes or materially contributes to the infringing conduct of another." *Cable/Home Commc'n Corp. v. Network Prods., Inc.*, 902 F.2d 829, 845 (11th Cir. 1990). Knowledge presents an objective inquiry, that is, did the person "[k]now, or have reason to know" of the activity. *Id.* "An individual, including a corporate officer, who has the ability to supervise infringing activity and has a financial interest in that activity, or who personally participates in that activity is personally liable for the infringement." *Broadcast Music, Inc. v. Behulak*, 651 F. Supp. 57, 59 (M.D. Fla. 1986) (quoting *S. Bell Tel. & Tel. v. Assoc. Tel. Dir. Publishers*, 756 F.2d 801, 811 (11th Cir. 1985)).

[20] The Court need not address the other statutory requirements, such as registration, because the parties' Motions raise only the issue of originality. *See* 17 U.S.C. § 411(a) ("[N]o civil action for infringement of the copyright in any United States work shall be instituted until preregistration or registration of the copyright claim has been made in accordance with this title."); 37 C.F.R. 202.11(d)(3) (providing that building designs published (or buildings actually constructed) before December 1, 1990 cannot be registered); *Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 166 (finding that Section 411(a)'s registration requirement is not jurisdictional).

protected. *Interest*, 554 F.3d at 920. "[O]nly the original, and thus protected arrangement and coordination of spaces, elements and other staple building components should be compared." *Id.* at 919; *see also id.* ("while individual standard features and architectural elements classifiable as ideas or concepts are not themselves copyrightable, an architect's original combination or arrangement of such elements may be"). Moreover, given the subtle distinction between protected and unprotected expression, the Eleventh Circuit has recognized that judges, rather than juries, are usually better equipped to resolve questions of infringement. *See id.* at 920 (the issue of "substantial similarity at the level of protectable expression . . . is often more reliably and accurately resolved in a summary judgment proceeding . . . because a judge is better able to separate original expression from the non-original elements of a work . . . ."). The Eleventh Circuit has further instructed that "copyright protection in a compilation is 'thin,'" *id.*, and that "modest dissimilarities are more significant than they may be in other types of art works." *Miller's Ale House*, 702 F.3d at 1326 (quoting *Howard v. Sterchi*, 974 F.2d 1272, 1276 (11th Cir. 1992)).[21]

Although the designs at issue in this case have similar features, Home Design must show that the *protectable elements* of the works are "substantially similar," recognizing that with architectural designs, "modest dissimilarities [in the respective coordination and arrangement of common elements] are more significant than they may be in other types of art works." *Miller's Ale House*, 702 F.3d at 1326; *Interest*, 554 F.3d at 918. In *Interest*, the Eleventh Circuit examined a set of floor plans similar to the floor plans at issue in this case, and found that the architectural works at issue were not substantially similar as a matter of law due to numerous, subtle differences in the plans' otherwise standard architectural features. *Interest*, 554 F.3d at 921. After quoting lengthy passages from the district court's Order, the Eleventh Circuit noted that "the district court carefully compared the protectable aspects of the two floor-plans at

---

[21] Patent law, rather than copyright law, is designed to protect innovative ideas. *See Mazer v. Stein*, 347 U.S. 201, 217 (1954) ("Unlike a patent, a copyright gives no exclusive right to the art disclosed; protection is given only to the expression of the idea—not the idea itself."). Whereas copyright law requires independent creation and a "minimal degree of creativity," *Feist*, 449 U.S. at 345, obtaining a patent requires both novelty and nonobviousness. 35 U.S.C. §§ 102-103; *See Baker v. Selden*, 101 U.S. 99, 102 (1879) ("To give to the author of the book an exclusive property in the art described therein, when no examination of its novelty has ever been officially made, would be a surprise and a fraud upon the public. That is the province of letters-patent, not of copyright.").

issue," and "focus[ed] only on the narrow arrangement and coordination of otherwise standard architectural features."  *Id.*  Differences identified by the district court, which the Eleventh Circuit acknowledged as significant, included different room dimensions, different garage entrance locations, the inclusion of a "bonus room" above the garage in one model but not the other, different locations of the air conditioning unit and water heater, and the inclusion of windows in the garage in one model but not the other.  *Id.* at 917 (quoting District Court's Order, Case No. 6:05-cv-1853-Orl-22JGG (May 7, 2007)).  Both the district court and the Eleventh Circuit further noted that although both designs included three bedrooms on the left side of the house and a master bedroom on the opposite side, there were differences between the various bedrooms across the two models.  For example, the bedroom closest to the garage is shaped differently in each model, the room's entrance is configured differently, and the closet doors are located on different walls.[22]  *Id.*  In addition, although both models included a bathroom at the end of a particular hallway, the bathroom's designs were different.  For example, the alignment of the bathroom's right wall vis-à-vis the hallway wall is different in the two plans.  Further, "the bathtubs face opposite ways in the two designs," "the bathroom sink counter space in [one model] is much smaller than in [the other]," and one sink is oval shaped whereas the other is round.  *Id.*  In the center of the home, there were differences in each home's "nook" area, the shape of the living room, and certain aspects of each kitchen, including the presence of an island in one model but not the other.  *See id.*  Finally, both courts identified dissimilarities in the foyer, the master bedroom, and the master bath, including the fact that one master bedroom "contains glass French Doors on the far left side of the back wall which opens into a Covered Patio," whereas the other model "simply has a sliding glass door in the center of the back wall which opens to an uncovered Porch."  *Id.*

Having carefully reviewed the models at issue in the present case in light of *Intervest*, the Court finds many of the same dissimilarities. At trial, Robert Koch identified numerous, material differences between the HDS-2089 and the Laurent and

---

[22] The *Intervest* court noted additional dissimilarities in the remaining bedrooms.  *See* 554 F.3d at 917.  For example, the court noted that the entrances and closets are different in the middle bedroom on the left side of each model; that the closet in one model runs nearly the entire length of one wall whereas the closet in the other model is deeper, smaller, and occupies only a corner of the bedroom.  *Id.*

Dakota designs, many of which he believed were included based on the overall style of the home: traditional versus modern.  For example, the porches are entirely distinct; the elevations are different; the fireplaces are in different locations; the hallways have different dimensions and openings; the nooks have different window designs; the water closets are positioned differently; the master bathroom in the Laurent has a linen closet separating the bathtub from the shower, which has a door-entry, but HDS-2089 places the linen closet between the water closet and the shower, which has a doorless entry; the Laurent's kitchen has cabinetry next to the stove range, but HDS-2089 has a desk; the wall separating the family room and the kitchen in HDS-2089 does not extend all the way to the ceiling like it does in the Laurent; there is no linen closet in the Laurent's pool bathroom like there is in HDS-2089; the secondary bedrooms have different windows and dimensions; and the living rooms have different angled walls abutting the family rooms, as well as different ceiling heights.  Koch also identified differences in doors and doorway designs throughout each model.[23]  These features are relevant and must be considered at the level of protected expression.  *See Intervest*, 554 F.3d at 916-17 (citing with approval the district court's comparison of similar architectural features).  Although Home Design's expert Kevin Alter described these differences as "modest," the Eleventh Circuit has made clear that "modest dissimilarities" are significant when comparing architectural works, *Miller's Ale House*, 702 F.3d at 1326, due to the fact that "there are only a limited number of ways" to organize standard architectural features, such that "similarities in the general layout of rooms can easily occur innocently."  *Id.*  Thus, the fact that the floor plans at issue are similar in their overall layout is not dispositive, but more importantly, the inclusion of standard architectural features, such as large living spaces in the middle of the home or secondary bedrooms located on a particular side of the house, are merely "ideas" that are generally unprotected (for example, the concept of a "split-bedroom" plan).  *See Intervest*, 554 F.3d at 916 & 921 (describing the common elements across the two floor plans at issue as four bedrooms,

---

[23] For example, Koch testified that the backdoor to the Laurent's screened porch swings inward, whereas the backdoor in HDS-2089 swings outward to a covered patio; the Laurent's master bedroom has a single door with a formal set of conventional windows on the primary bed wall, but HDS-2089 has double doors with a high window located above the bed; the Laurent has a door between the master bedroom and the master bathroom, whereas the HDS-2089 does not; the door between the garages and the mud rooms swing in different directions.

a two-car garage, living room, dining room, family room, foyer, kitchen, two bathrooms, a nook, and a porch, but finding that no reasonable jury could find the two floor plans at issue "substantially similar," even though they each had a similar overall layout of rooms and living spaces).  *See also Building Graphics, Inc. v. Lennar Corp.*, 866 F.Supp.2d 530, 544-45 (W.D. N.C. 2011) ("a court can find designs to be visually similar with the same general layout and nonetheless find the dissimilarities significant enough to preclude a finding of infringement"); *Home Design Servs. v. David Weekley Homes, LLC*, 548 F. Supp. 2d 1306, 1313 (M.D. Fla. 2008) ("there are only a finite number of ways a rectangle can be divided into bedrooms, baths, kitchen, living room, closets and so on.").  Accordingly, although the general layout of each floor plan at issue is similar, and in that regard is reminiscent of those at issue in *Interest*, the Court finds the dissimilarities dispositive, especially in light of the instruction that "modest dissimilarities" are more significant in architectural designs than they are in other types of art works.  *Miller's Ale House*, 702 F.3d at 1326.

In light of *Interest*, the Court finds that no jury following the Court's instructions on the law could reasonably find the Laurent and Dakota designs *substantially* similar to HDS-2089 given the amount of significant dissimilarities between the plans at the level of protected expression.  To find infringement on this record, the jury in this case must have disregarded the significant differences that existed at the level of protected expression and focused instead on the unprotected similarities in the designs.  This is erroneous as a matter of law.  *See Interest*, 554 F.3d at 919 (stating that "any similarity comparison of the works at issue . . . must be accomplished at the level of protected expression"); Doc. 412, at 29; Doc. 425, at 130 (instructing the jury that "overall similarity in look and feel will not outweigh significant differences in the designs").  *See also, e.g., David Weekley Homes, LLC*, 548 F.Supp. 2d at 1313-14 (finding similarities in general layout between the disputed home designs, but concluding that no reasonable jury could find the designs substantially similar due to differences in the floor plans, facades, and roofs); *Building Graphics*, 866 F.Supp.2d at 544-45 (finding a number of differences between the home designs at issue such that no reasonable jury could find defendant's designs substantially similar to plaintiff's plans); *Miller's Ale House*, 702 F.3d at 1326-27 (affirming district court's grant of summary judgment to

defendant due to differences in the respective floor plans, despite similarities in their general layouts).

Having reached this conclusion regarding infringement, the Court need not address whether Home Design owns a valid copyright, or whether Fred Turner may be held individually liable. The Court will, however, consider Defendants' arguments in the context of its alternative motion for a new trial.

<u>Defendants' Motion for New Trial</u>

A party may include an alternative request for a new trial under Rule 59 in its Motion for Judgment as a Matter of Law. *See* Fed. R. Civ. P. 50(b). "If the court grants a renewed motion for judgment as a matter of law, it must also conditionally rule on any motion for a new trial by determining whether a new trial should be granted if the judgment is later vacated or reversed." Fed. R. Civ. P. 50(c)(1). Pursuant to Rule 59, the court has the discretion to grant a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court," Fed. R. Civ. P. 59(a), including on grounds "that the verdict is against the clear weight of the evidence." *B & F System, Inc. v. LeBlanc*, No. 7:07cv192, 2012 WL 2529191, at *3 (M.D. Ga. June 29, 2012) (quoting *Lipphardt v. Durango Steakhouse of Brandon, Inc.*, 267 F.3d 1183, 1186 (11th Cir. 2001)). However, because the court should not substitute its own judgment for that of the jury's, "new trials should not be granted on evidentiary grounds unless, at a minimum, the verdict is against the great—not merely the greater—weight of the evidence." *Id.* (quoting *Lipphardt*, 267 F.3d at 1186).

Defendants base their arguments for a new trial on three grounds. First, Defendants argue that a new trial is warranted on the question of infringement. To the extent the Court's decision regarding substantial similarity is reversed on appeal, *see* Fed. R. Civ. P. 50(c)(1), the Court finds that a new trial on infringement is not necessary given the jury's finding of substantial similarity.[24] Second, Defendants argue that a new trial is required regarding the validity of Home Design's copyright because Home Design failed to establish that HDS-2089 was an original design. The Supreme Court has

---

[24] If the Court's decision is reversed on appeal, the Eleventh Circuit presumably will find that the jury's verdict on the question of substantial similarity should stand, as there is no direct evidence of copying in this case, but rather a suggestion of copying by the fact of Defendants' access to the HDS-2089, such that the issue of infringement depends on the substantially similar inquiry. *See Miller's Ale House*, 702 F.3d at 1325; *David Weekley Homes, LLC*, 548 F.Supp. 2d at 1313.

explained that originality requires independent creation and a "minimal degree of creativity." *Feist*, 499 U.S. at 345; *see also Southco Inc. v. Kanebridge Corp.*, 258 F.3d 148, 152 (3d Cir. 2001) (stating that "the originality requirement is not demanding"). Zirkel testified that he created HDS-2089, and although he admitted that there were prior designs like the Timberwood and HDS-2041 in use at the time, he testified that he did not use the Timberwood to develop HDS-2089 and that HDS-2041 was not related in any way to HDS-2089.  A reasonable jury could have relied on this testimony to find independent creation.  Further, Zirkel identified differences among the Timberwood, HDS-2041, and HDS-2089 sufficient for the jury to find minimal creativity in HDS-2089. *See Feist*, 499 U.S. at 345 ("[T]he requisite level of creativity is extremely low; even a slight amount will suffice.").  Accordingly, the Court cannot say that the jury's finding on validity is against the great weight of the evidence.  Finally, Defendants argue that there was no evidence to support the jury's finding that Fred Turner was liable for infringement.   The jury was instructed on the law that "[a]n individual, including a corporate officer, who has the ability to supervise infringing activity and has a financial interest in that activity, or who personally participates in that activity is personally liable for the infringement."  *Broadcast Music, Inc.*, 651 F. Supp. at (quoting *S. Bell Tel. & Tel.*, 756 F.2d at 811.  Doug Turner testified that he and Fred Turner were directors of Turner Heritage Homes, and had the ability to control the company.  Doug stated that Fred was the named manager of one selling company and the chief executive officer of another. Doug also said that he and Fred supervised and approved what the selling companies built and sold in exchange for cash distributions.  Thus, there was sufficient evidence to support the jury's finding on Fred Turner's individual liability, and thus a new trial on liability would not be warranted in the event the Court's ruling on infringement is overturned.  *See* Fed. R. Civ. P. 50(c)(1).

Plaintiff's Motion for Judgment as a Matter of Law or for New Trial - Damages

Home Design moves for Judgment as a Matter of Law, pursuant to Rule 50, regarding the jury's failure to award damages in profits attributable to the infringement, and alternatively moves for a new trial on damages pursuant to Rule 59.  Home Design argues that the undisputed evidence showed that Doug and Fred Turner received $2,366,392.50 in distributions attributable to the revenues from the sales of Defendants'

Laurent and Dakota homes, and that these funds were paid to the Turners as profit. Home Design asks the Court to overturn the jury's verdict and enter judgment jointly and severally against all Defendants in the amount of $2,366,392.50. Home Design alternatively requests a new trial on the issue of damages, arguing that the great weight of the evidence contradicts the jury's damages verdict. In response, Defendants argue that substantial evidence supports the jury's finding that Defendants made no profit specifically attributable to the infringing home designs, and that even if the jury found profits to exist, the jury presumably included those profits in its award of actual damages.[25]

Assuming infringement is proven, the plaintiff may recover his or her "actual damages and any additional profits of the infringer . . . that are attributable to the infringement and are not taken into account in computing the actual damages." 17 U.S.C. § 504(a)(1) & (b). To prove actual damages, the plaintiff must "demonstrate a 'causal connection' between the defendant's infringement and an injury to the market value of the plaintiff's copyrighted work at the time of infringement."[26] *Montgomery v. Noga*, 168 F.3d 1282, 1294 (11th Cir. 1999). This injury is usually "measured by the revenue that the plaintiff lost as a result of the infringement." *Id.* at 1295 n.19. With respect to profits, the plaintiff must show a causal relationship between the infringement and profits, and must also present proof of the infringer's gross revenue. *See* 17 U.S.C. § 504(b); *Montgomery*, 168 F.3d at 1296. If the plaintiff meets its burden, the infringer must then prove "his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work."[27] *Id.*

---

[25] The Court considers Home Design's motion on the issue of damages as if the Court's decision on the question of "substantial similarity" is overturned on appeal.

[26] Once the plaintiff establishes a reasonable probability of this connection, "the burden shifts to the infringer to show that the damage would have occurred had there been no taking of copyrighted expression." *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 541 (1985).

[27] In cases of multiple defendants, the general rule is that "all infringers are jointly and severally liable for plaintiffs' actual damages, but each defendant is severally liable for his or its own illegal *profit*; one defendant is not liable for the profit made by another." *Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.*, 772 F.2d 505, 519 (9th Cir. 1985) (emphasis in original); *see also FSC Franchise Co., LLC v. Express Corp. Apparel, LLC*, No. 8:09cv454, 2011 WL 1226002, at *8 (M.D. Fla. Feb. 28, 2011), *report and recommendation adopted*, 2011 WL 1153840. However, joint and several liability may extend to an infringer's profits if the defendants act as partners, joint venturers, or partners-in-fact. *See Belford, Clarke & Co. v. Scribner*, 144 U.S. 488, 507-08 (1892); *Nelson-Salabes, Inc. v. Morningside Dev., LLC*, 284 F.3d

The essence of Home Design's argument is that the jury was obligated to find from the evidence that the "return on equity" payments made to the Turners reflected profits solely attributable to the infringing home designs.  There are several flaws in this argument.  First, even assuming the "return on equity" payments constitute "profit" to the Turners rather than a "deductible expense" of Turner Heritage Homes, *see* 17 U.S.C. § 504(b), the jury reasonably could have found that the Defendants earned no profits actually *attributable to the offending home designs*.  There was plenty of evidence on which the jury could have attributed profits to rapidly rising land values, location, square footage, a home's detailing and curb appeal, and the overall quality of construction.  Fishkind testified, for example, that Defendants' net profits were wholly attributable to land value.  *See* Doc. 424, at 258-59.  In addition, Doug Turner testified that "the value [that] is typically generated in a new home" comes primarily from "the location [including] the [nearby] schools, shopping, [and] how close you are to work."  Doc. 423, at 77-78.  Turner also testified that there is no additional amount added to the price of home based on the particular floor plan employed, and that "[t]he market really didn't see a lot of value in a particular plan . . . ."  *Id.* at 122.  Moreover, Turner testified that his company competed with other builders by attracting buyers through unique exterior designs and through its interior detailing, such as "how you trim molding" and "the way you design your kitchens."  *See id.* at 83.  Finally, Turner testified that quality of construction played a large role in attracting buyers and thus earning a profit.  *See id.* at 96.  Based on this testimony, the jury reasonably could have found that Defendants' profits were attributable to factors other than the infringing home designs.  *See also Bonner v. Dawson*, 404 F.3d 290, 294-95 (4th Cir. 2005) (rejecting plaintiff's argument that it is entitled to judgment as a matter of law on the issue of defendants' ability to show that their profits were derived from sources other than the infringement because the jury reasonably could have found the profits attributable to other factors).

There was also evidence to support a finding that Defendants did not earn any profit on the sale of its homes.  The parties stipulated that the selling companies' gross profits related to the 165 infringing homes was $1,789,925, and that Turner Heritage

---

505, 517-18 (4th Cir. 2002); *Frank Music*, 772 F.2d at 519-20; *FSC Franchise*, 2011 WL 1226002, at *8; 3 Nimmer on Copyright § 12.04.

Homes's gross profits relating to those same homes was $5,571,797.  *See* Doc. 424, at 236.  From those figures, defense expert Henry Fishkind deducted administrative expenses of $4,562,326 (including items such as salaries, office rents, costs of supplies), and concluded that the companies' total earnings before interest and taxes were $2,799,396.  *See id.* at 242.  Fishkind then deducted interest expenses on the companies' lines of credit and mortgages totaling $1,330,776, which he described as a common expense for homebuilders, *id.* at 245, leaving approximately $1.4 million in net profit from the sale of the subject homes.  *See id.* at 257.  In determining the origin of these profits, Fishkind identified an estimated profit due to land appreciation of $1,720,327, which he explained resulted from the speculative bubble and rising land prices from 2000 to 2008.  *See id.* at 246-48.  After subtracting this amount, Fishkind determined there was no profit left over, and that the Defendants had incurred a loss on their Laurent and Dakota homes.  Thus, the jury reasonably could have found that any net "profit" (approximately $1.4 million) had been fully accounted for, in the form of profits attributable to land appreciation, such that there was simply no profit attributable to any particular home design.[28]  Regarding the remaining "return on equity" payments, Fishkind testified that builders typically classify such payments as expenses, which, he believed, gave the Defendants an even greater loss.  *See* Doc. 424, at 249-51.  The fact that Turner Heritage Homes and its selling companies are no longer in business supports his analysis, and although Fishkind was subject to rigorous cross-examination, his expert testimony was not rebutted.  Thus, contrary to Home Design's argument, the jury reasonably could have found that the alleged "profits" the Turner's made in the form of "return on equity" payments were not actually profits at all, or that they were simply not attributable to a particular home design.[29]

Finally, the Court cannot rule out the possibility that although the jury did not separately classify the return on equity payments as "profit" attributable to infringement,

---

[28] Fishkind testified that it was his opinion that there was no profit attributable to any particular home design.  *See* Doc. 424, at 251 & 259-60.

[29] Based on this same testimony, the jury reasonably could have found that the companies' profits were ultimately reduced to zero due to the difficult real estate market conditions at the time.  Fishkind testified, for example, that "the company consumed its own capital, couldn't pay its owners any return and had no return left, and so they are not in business.  It's tragic, but that happened to a lot of small and medium size regional homebuilding companies during this period of time."  Doc. 424, at 259.

the jury nonetheless took those amounts into account in its computation of *actual damages*.  As noted, the governing statute provides that when infringement is proven, a plaintiff may recover his or her "actual damages and any additional profits of the infringer . . . that are attributable to the infringement *and are not taken into account in computing the actual damages*."   17 U.S.C. § 504(a)(1) & (b) (emphasis added).  Here, the jury's actual damages award of $127,760 was consistent with the *highest* of three actual damages calculations Fishkind presented to the jury, and although Fishkind believed Defendants had no profits attributable to their floor plans, Fishkind further testified that the *maximum* profit a builder could expect to earn from a floor plan costing $1,000 (or from any similarly-priced building component) would be $200, resulting in a potential profit across the 165 floor plans at issue of no more than $33,000.  *See* Doc. 424, at 220-21 & 228-32 (calculating Home Design's actual damages as either $125,000, based on prices advertised on the company's website for the floor plans at issue; $57,000, based on the prices other builders paid for multiple uses of the HDS-2089 plan; or $17,000, based on a contract between Home Design and another builder, which Fishkind believed was the most accurate of the three calculations).  Thus, the jury's verdict could have reasonably reflected a finding of approximately $100,000 in damages for lost design revenues, along with another $27,000 in profits directly attributable to the floor plans at issue (or some similar combination).   Any such determination would be consistent with the governing statutory requirements, which were accurately conveyed in the jury instructions.  *See* Doc. 412, at 34 (instructing the jury as follows:  "In addition to actual damages, the copyright owner is entitled to any profits of the Defendant attributable to the infringement.  You may not include in an award of profits any amount that you took into account in determining actual damages.");  *see also 3M v. Pribyl*, 259 F.3d 587, 600 (7th Cir. 2001) ("absent evidence to the contrary, we assume that juries follow a court's instructions").  Thus, Home Design is not entitled to judgment as a matter of law on the question of damages pursuant to Rule 50, or a new trial on damages in the event the Court's ruling on infringement is reversed.

For these reasons, it is ORDERED:

1.      Defendants' Motion for Judgment as a Matter of Law (Doc. 429) is **GRANTED in part** regarding the jury's finding of infringement and **DENIED in part** as moot regarding validity and the individual liability of Fred Turner.

2.      Defendants' Motion for a New Trial (Doc. 429) is **conditionally DENIED** regarding the jury's finding of infringement, validity, and the individual liability of Fred Turner.

3.      Plaintiff's Motion for Judgment as a Matter of Law (Doc. 428) regarding profits is **DENIED**.

4.      Plaintiff's Motion for a New Trial (Doc. 428) regarding profits is **conditionally DENIED**.

5.      Plaintiff's Motion for Leave to File a Reply (Doc. 434) is **DENIED** as moot.

6.      Plaintiff's Motion to Exclude the Testimony of Defendants' Expert Robert Koch (Doc. 393) is **DENIED** for the reasons stated in open court.  *See* Doc. 422, at 13.

7.      Plaintiff's Motion for a Curative Instruction to the Jury (Doc. 394) is **DENIED** as moot.

8.      In light of the Court's rulings on the parties' renewed Motions for Judgment as a Matter of Law, the parties' initial Motions made in open court (Docs. 408, 410) are **DENIED** as moot.

9.      The Clerk is directed to enter final judgment in favor of Defendants and against Plaintiff.

**DONE and ORDERED** this 31st day of March, 2015.

*M. Casey Rodgers*

**M. CASEY RODGERS**
**CHIEF UNITED STATES DISTRICT JUDGE**